# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

J.T.,

      Plaintiff,

  v.

DISTRICT OF COLUMBIA,

      Defendant.

Case No. 24-cv-1400-RDM-MJS

## REPORT AND RECOMMENDATION

This case presents the latest episode in a long-running saga surrounding whether the District of Columbia Public Schools ("DCPS" or the "District") met its obligations to provide minor student V.T. a free appropriate public education ("FAPE") under the Individuals with Disabilities Act ("IDEA"). This installment focuses on the 2021–22 school year. For that year, a Hearing Officer determined that DCPS failed to offer V.T. a FAPE in several respects but nevertheless refused to entertain an award of compensatory education based on those denials. V.T.'s mother, J.T., now challenges that outcome, principally arguing that the Court should remand for further proceedings on the issue of compensatory education. Secondarily, J.T. contends that the Hearing Officer improperly brushed aside other alleged IDEA violations and wrongly rejected her claim seeking what she contends were "educational records" from DCPS, namely class rosters and various emails. Both J.T. and the District have filed dueling summary judgment motions, which are before the undersigned by virtue of a referral for full case management. The Court has thoroughly reviewed the administrative record, the parties' briefing and arguments, and governing precedent. The Court concludes that the Hearing Officer erred in rejecting J.T.'s request for compensatory education based on what was tantamount to a waiver finding and that certain (but

1

not all) of J.T.'s claims for the 2021–22 school year warrant another look on remand. But the Court finds that the Hearing Officer appropriately denied J.T.'s request for additional documents as "educational records." Accordingly, the undersigned **RECOMMENDS**, for the reasons explained below, that the Court **GRANT IN PART** and **DENY IN PART** both Plaintiff's motion for summary judgment (ECF No. 21) and the District's motion (ECF No. 23).

## STATUTORY FRAMEWORK

Congress enacted the IDEA to help ensure all children with disabilities receive a "free appropriate public education" or "FAPE." *See* 20 U.S.C. § 1400(d)(1)(A). This mandate "requires an educational program reasonably calculated to enable a child to make progress in light of the child's circumstances." *Endrew F. v. Douglas Cnty. Sch. Dist.*, 580 U.S. 386, 403 (2017).

The "IEP"—or "individualized education program"—is "the centerpiece of the statute's education delivery system[.]" *Id.* at 391. An IEP is a "comprehensive plan prepared by a child's 'IEP Team'" that serves as "the means by which special education and related services are 'tailored to the unique needs' of a particular child." *Id.* (quoting *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 181 (1982)).[1] Under the statute, an IEP must include "a statement of the child's present levels of academic achievement and functional performance," a list of "measurable annual … academic and functional goals," and "a description of how the child's progress toward meeting the annual goals … will be measured." 20 U.S.C. § 1414(d)(1)(a)(i). An IEP must also identify the "special education and related services … that will be provided" to help the child "advance appropriately toward attaining the annual goals." *Id.* And, at least annually, the IEP Team must meet to review and revise a child's IEP "as appropriate." *Id.* § 1414(d)(4).

---

[1] The composition of an "IEP Team" is prescribed by statute, 20 U.S.C. § 1414(d)(1)(B), and generally "includes teachers, school officials, and the child's parents," *Endrew F.*, 580 U.S. at 391.

A court reviewing "an IEP must appreciate that the question is whether the IEP is *reasonable*, not whether the court regards it as ideal." *Endrew F.*, 580 U.S. at 399 (emphasis in original). After all, "Congress has not committed to educational perfection." *Z.B. v. Dist. of Columbia*, 888 F.3d 515, 528 (D.C. Cir. 2018); *Leggett v. Dist. of Columbia*, 793 F.3d 59, 70 (D.C. Cir. 2015) ("[A] public school district need not guarantee the best possible education or even a potential-maximizing one.") (citation and quotations marks omitted). Moreover, any judicial assessment of an IEP's "substantive adequacy" must be based on information "as of the time each IEP was created rather than with the benefit of hindsight." *Edward M.R. v. Dist. of Columbia*, 128 F.4th 290, 294 (D.C. Cir. 2025) (quoting *Z.B.*, 888 F.3d at 524). Putting the two principles together, then, "[t]he key inquiry regarding an IEP's substantive adequacy is whether, taking account of what the school knew or reasonably should have known of a student's needs at the time, the IEP it offered was reasonably calculated to ensure the specific student's progress." *Z.B.*, 888 F.3d at 524.

"When a hearing officer or district court concludes that a school district has failed to provide a student with a FAPE, it has 'broad discretion to fashion an appropriate remedy,'" which can include "compensatory education." *B.D. v. Dist. of Columbia*, 817 F.3d 792, 797–98 (D.C. Cir. 2016) (quoting *Boose v. Dist. of Columbia*, 786 F.3d 1054, 1056 (D.C. Cir. 2015)). Compensatory education comprises prospective educational services meant to "compensate for a past deficient program." *Reid v. Dist. of Columbia*, 401 F.3d 516, 522 (D.C. Cir. 2005); *see also id.* at 518 (describing compensatory education as the "replacement of educational services the child should have received in the first place"). As the D.C. Circuit has explained: "An appropriate compensatory education award must rely on individualized assessments, and the equitable and flexible nature of the remedy will produce different results in different cases depending on the child's needs." *B.D.*, 817 F.3d at 798 (citing *Reid*, 401 F.3d at 524).

## RELEVANT FACTUAL BACKGROUND

The claims here implicate the 2021–22 school year, so the Court focuses its factual overview accordingly, along with some additional high-level background for context.[2]

J.T.'s son, V.T., is a student with autism spectrum disorder who suffers from sensory processing issues—the record indicates he is a "sensory seeker for visual stimuli and an extreme sensory avoider for sounds." (ECF No. 13, Administrative Record ("AR") at 11.)[3] Given this, DCPS found V.T. eligible for special education services several years back. Per an agreement between J.T. and the District, DCPS began providing virtual instruction to V.T. starting in June 2020 and continuing through the 2020–21 school year. (*Id.* at 12.) In July 2020, when V.T. was a rising fifth grader enrolled (virtually) at DCPS's Garrison Elementary School, an IEP Team developed an IEP for him—amended in October 2020 to correct a typographical issue—providing for full-time specialized instruction outside of general education, along with multiple related services. (*Id.* at 15, 76–109.) Specifically, the IEP provided for: (a) 24 hours per week of specialized instruction; (b) 360 minutes per month of speech-language pathology; (c) 360 minutes per month of occupational therapy; and (d) 240 minutes per month of behavioral support services. (*Id.*) It also provided for the support of a dedicated aide for six hours per day, as well as specialized instruction in a highly structured small-group setting (*i.e.*, numbering six to nine students). (*Id.*)

---

[2] This is far from J.T.'s first foray into federal IDEA litigation, however. J.T. has pursued several prior lawsuits challenging DCPS's educational placements for V.T. and its overall compliance with IDEA, meeting with mixed success along the way. *See, e.g.*, *J.T. v. Dist. of Columbia* ("*J.T. I*"), 496 F. Supp. 3d 190 (D.D.C. 2020) (awarding compensatory education based on DCPS's "failure to identify [a] placement for [V.T.] for the 2019–2020 school year," but denying other claims), *aff'd*, 2022 WL 126707 (D.C. Cir. Jan. 11, 2022); *J.T. v. Dist. of Columbia* ("*J.T. II*"), 2023 WL 9121577 (D.D.C. Jan. 4, 2023) (denying relief), *report and recommendation adopted*, 2023 WL 8369938 (Dec. 4, 2023), *appeal dismissed*, 2024 WL 3033764 (June 14, 2024). Curious readers can consult these prior rulings for a more fulsome history.

[3] Page citations to the AR refer to the running pagination in the lower middle margin. Page citations to the parties' briefing, by contrast, refer to the ones assigned by the Court's electronic filing system.

The record reflects that V.T. made meaningful progress during the 2020–21 school year. IEP progress reports for the year show that V.T. mastered several academic goals (in math and written expression) and three motor skills/physical development goals, and V.T. progressed in many other goals. (AR at 110–19.) His end-of-year report card stated that V.T. made "a lot of academic progress" and participated in "at least 80% of his classes independently." (*Id.* at 1320.)

In May 2021, DCPS scheduled an IEP meeting to review and revise V.T.'s IEP, to the extent necessary, for the 2021–22 school year. (AR at 417–31.) Despite the District's efforts to secure their attendance at the IEP meeting, V.T.'s parents would not participate, so DCPS filed an administrative due process complaint to secure an order that they do so. (*See id.*)[4] A hearing officer issued a decision on that complaint in October 2021, ordering DCPS to convene an IEP meeting to develop an updated IEP within fourteen days and ordering that the parents "shall participate." (*Id.* at 428.) The decision indicated that "[a]ny delay in [DCPS] meeting the timelines of [the] order that is the result of action or inaction by [the parents] shall extend the timelines on a day for day basis." (*Id.* at 428 n.8) Meanwhile, on August 31, 2021, DCPS approved V.T.'s request for a virtual placement for the 2021–22 school year. (*Id.* at 287; *see also id.* at 276.)

The District moved promptly to set up the IEP meeting that had been ordered by the hearing officer, and DCPS sent a letter of invitation to V.T.'s parents for a meeting to be held on November 3, 2021. (AR at 432.) Through counsel, the parents responded soon afterward, indicating that the proposed date "will not work" and asking for alternative dates. (*Id.* at 399–401.) For reasons unexplained, though, DCPS moved forward with the IEP meeting on November 3 anyway and developed a new IEP without V.T.'s parents' participation or input.

---

[4] Based on the record, it appears that V.T.'s parents wished to postpone that IEP meeting pending the completion of an independent educational evaluation and a transportation study. (AR at 417–31.)

The November 2021 IEP reduced V.T.'s occupational therapy hours and removed him from full-time special education. Additionally, the IEP contemplated in-person learning for V.T., despite his documented—and DCPS-approved—need for remote instruction. (AR at 440–61.)

While those issues played out, V.T. had started the 2021–22 school year in a virtual placement assigned to Alice Deal Middle School ("Deal"), in its Communications and Educations Supports ("CES") classroom. (AR at 253.) According to J.T., the placement was "a disaster from the beginning." (*Id.* at 1464.) The Hearing Officer's findings of facts credited some of the challenges J.T. recounted, which the decision summarized as follows:

> [V.T.'s] online services at [Deal] had many problems. [V.T.] was not able to log in to the CES classroom. [V.T.] was the only distance learning student and he … could only view the teacher and the blackboard – not the rest of the class. [V.T.] could not follow the teacher in class and [J.T.] had to work with him … There was no visual aids or instructions for [V.T.] It was difficult to communicate with the dedicated aide because the aide did not have a computer to be [online] with [V.T.] or the class.

(AR at 21.) In addition, J.T. contends that the CES classroom had more than ten students, above the nine-student maximum contemplated by his IEP. (*Id.* at 1466 (J.T. testifying that the teacher told her it was a "class of more than 10 kids")).) J.T. contends she repeatedly attempted to work with the teacher and other staff to address these problems, without much success.

Ultimately, in December 2021, J.T. arranged "for the teacher to send paper copies of the core academic materials home," and J.T. did her best to educate V.T. herself. (AR at 21–22, 1474–75.) J.T. candidly recognized, however, that she is "not a specialist" and does not herself have the "confidence" or "ability of a special education teacher." (*Id.* at 1475.)

In notable contrast to the prior 2020–21 school year, the IEP progress reports for V.T. for the 2021–22 school year reflect that he did not master any of his academic goals and failed to even "progress" toward half of them. (*Id.* at 1074–78.) The progress reports do indicate, however, that V.T. progressed in other non-academic areas. (*Id.* at 1078–84.)

Relatedly, although J.T. acknowledges that V.T. was able to receive some of his specified services remotely from DCPS during the 2021–22 school year, she says DCPS failed to provide many of those services, at least in meaningful part. For one, although the IEP prescribed six hours per month of speech-language therapy (totaling around 54 hours for the school year), J.T. contends that DCPS provided less than half of that amount, totaling only about 24 hours of services. (AR at 314–27.) Similarly, although the IEP prescribed four hours per month of behavioral support services (totaling around 36 hours for the school year), J.T. says DCPS provided less than half of that amount, totaling only about 15.5 hours of services. (*Id.* at 328–42.)

After the 2021–22 school year, V.T.'s parents removed him from DCPS altogether and enrolled him in a private school, Friendship Public Charter School. (AR at 22, 1502–03.) According to J.T.'s testimony, V.T. has been doing "very well" in that setting. (*See id.*)

## PROCEDURAL BACKGROUND

On August 21, 2023, J.T. filed the due process complaint preceding this lawsuit, which was amended on September 13, 2023, after the Hearing Officer ruled the original complaint was too non-specific. (AR at 6, 518–21, 576–79.) Through the amended complaint, J.T. claimed the November 2021 IEP was improper because it: (1) was developed without parental participation; (2) prescribed too few hours of specialized instruction and occupational therapy; (3) did not include extended school year or transportation accommodations; (4) prescribed a classroom that was too large; and (5) prescribed insufficient calming strategies and equipment. (AR at 577.) Additionally, J.T. claimed that that V.T.'s placement at Deal was inappropriate on various grounds, including because Deal failed to provide: (1) all the specialized instruction, occupational therapy, behavioral support services, and speech-language pathology prescribed by V.T's IEP; (2) a sufficient amount of specialized instruction, occupational therapy, behavioral support services, and

speech-language pathology; (3) the class size prescribed by the IEP; and (4) an appropriately small classroom. (*Id.*)[5] On a parallel track, J.T. filed a separate due process complaint alleging that DCPS violated the IDEA by failing to produce various "education records." (*Id.* at 6, 608–10.)

As relief for these claims, J.T. requested that DCPS be ordered to do one of the following: (a) award "appropriate compensatory education"; (b) "determine appropriate compensatory education for V.T. through an appropriately staffed IEP meeting"; or (c) "fund an independent compensatory education evaluation," to be followed by further proceedings as needed to determine the amount of an award based on the results of the evaluation. J.T. additionally asked that DCPS be ordered to provide the requested records about V.T. (AR at 578, 609.)

The Hearing Officer consolidated the due process complaints and convened an administrative hearing covering all the various claims over two consecutive days on January 30 and 31, 2024. During the hearing, five witnesses testified on behalf of DCPS, and J.T. testified on her behalf. The Hearing Officer issued a determination on February 13, 2024, less than two weeks after the hearing closed, ruling in J.T.'s favor in some respects but not others. (AR at 4–46.)

Starting with the rulings in J.T.'s favor, the Hearing Officer determined that DCPS committed a procedural IDEA violation by holding the November 2021 IEP meeting without the participation of V.T.'s parents, which resulted in the denial of a FAPE. (AR at 25–28.) Moreover, the Hearing Officer concluded that the IEP developed by DCPS in November 2021 (without the input or participation of V.T.'s parents) was substantively deficient because "[Deal] could not provide [V.T.] his … required specialized instruction in an appropriate setting." (*Id.* at 28–30.) This was principally because DCPS "ignor[ed] that [V.T.] was approved for virtual education" and instead proposed "an in-person placement." (*Id.* at 30 ("I conclude that DCPS' proposal of an in-

---

[5] J.T. withdrew her claims for extended school year services, transportation accommodations, insufficient calming strategies and equipment, and occupational therapy during the hearing. (AR at 1427–28.)

person educational placement for [V.T.] – when the District was fully aware that [V.T.] was certified by a physician to require virtual learning – was not specially tailored to meet [V.T.'s] unique needs. DCPS' proposed educational placement for [V.T.] in the November 3, 2021 IEP was therefore not appropriate and this was a denial of FAPE.").)

On the other hand, the Hearing Officer ruled against J.T. on other points. For one, the Hearing Officer disagreed that the November 2021 IEP offered too few hours of specialized instruction and occupational therapy. (AR at 30–31.) For another, the Hearing Officer found that DCPS did not deny V.T. a FAPE by failing to provide all the specialized instruction, speech-language pathology, and behavioral support services prescribed by the IEP. (*Id.* at 31–34.) As to behavioral support, the Hearing Officer credited the social worker's testimony "that she was pretty consistent with [V.T.'s] services" and said J.T. did not rebut that testimony. (*Id.* as 32.) As to speech-language therapy, although the Hearing Officer found that DCPS failed to provide "some 15%" of the service hours required by V.T.'s IEP, the Hearing Officer reasoned that this "shortfall" did not deprive V.T. of "substantial educational benefit." (*Id.* at 33–34.) Still more, the Hearing Officer found that J.T.'s claim that the classroom size exceeded the maximum students contemplated by the IEP was "moot" because V.T. attended classes virtually. (*Id.* at 32.) Finally, the Hearing Officer denied J.T.'s records claim, concluding that the requested class rosters and relevant emails were not "education records" under the statute. (*Id.* at 34–37.)

Turning to remedy, the Hearing Officer began by reiterating the identified denials of FAPE by DCPS related to the November 2021 IEP: "proceeding with the November 3, 2021 IEP meeting without the Parents' participation and … offering an inappropriate in-person educational placement in the IEP, when [V.T.] was only attending school online." (AR at 37.) But the Hearing Officer declined to consider any compensatory education award because J.T. did not "propose a

well-articulated compensatory education plan" during the hearing. (*Id.* at 40; *id.* at 41 ("Because Petitioners have failed to demonstrate what compensatory education, if any, should be provided to Student for the denials of FAPE in this case, I will deny the Parents' request for a compensatory education award.").) The Hearing Officer grounded this conclusion in the rationale of *JT II,* 2023 WL 8369938, at *13–15 (D.D.C. Dec. 4, 2023), which the Hearing Officer found persuasive on the basis that it "concerned the same parties and [was] so recent[.]" (*Id.* at 40.)

J.T. then timely filed this lawsuit to challenge the Hearing Officer's decision in various respects. (ECF No. 1, Compl.) After lodging the administrative record, the parties proceeded to brief cross motions for summary judgment, which are now ripe for resolution.

## LEGAL STANDARDS

Although motions seeking review of a hearing officer decision are typically framed as motions for summary judgment, the Court does not follow "a true summary judgment procedure" in this context. *Middleton v. Dist. of Columbia*, 312 F. Supp. 3d 113, 128 (D.D.C. 2018) (quoting *L.R.L. v. Dist. of Columbia*, 896 F. Supp. 2d 69, 73 (D.D.C. 2012)). Rather, "[a] motion for summary judgment operates as a motion for judgment based on the evidence comprising the record and any additional evidence the court may receive." *D.R. v. Dist. of Columbia*, 637 F. Supp. 2d 11, 16 (D.D.C. 2009). Put another way, the motion for summary judgment is "the procedural vehicle for asking the judge to decide the case on the basis of the administrative record." *M.G. v. Dist. of Columbia*, 246 F. Supp. 3d 1, 8 (D.D.C. 2017) (citation omitted).

On judicial review under the IDEA, courts "shall grant such relief as [they] determine[] is appropriate," based upon "a preponderance of the evidence." 20 U.S.C. § 1415(i)(2)(C); *see also Rowley*, 458 U.S. at 205–06. In doing so, courts may not "substitute their own notions of sound educational policy for those of the school authorities which they review." *Rowley*, 458 U.S. at 206.

Rather, courts "must give due weight to the administrative proceedings and afford some deference to the expertise of the [independent hearing officer] and school officials responsible for the child's education." *Gill v. Dist. of Columbia*, 751 F. Supp. 2d 104, 108 (D.D.C. 2010) (citation and quotation marks omitted). In general, "a hearing officer's findings based on credibility determinations of live witness testimony are given particular deference where there is no supplementation of the record." *McAllister v. Dist. of Columbia*, 45 F. Supp. 3d 72, 76–77 (D.D.C. 2014) (citation and quotation marks omitted). But "a hearing decision 'without reasoned and specific findings deserves little deference.'" *Reid*, 401 F.3d at 521 (quoting *Kerkam v. Superintendent, D.C. Pub. Schs.*, 931 F.2d 84, 87 (D.C. Cir. 1991)).

## ANALYSIS

The principal issue presented here is a relatively focused one: whether the Hearing Officer properly declined to consider a compensatory education award based on what amounted to an implicit finding that J.T. waived any entitlement to relief by not adducing sufficient evidence of a "well-articulated compensatory education plan." J.T. separately challenges some of the Hearing Officer's rulings on the claims that DCPS did not properly implement the operative IEP during the 2021–22 school year, including prior to November 2021. Finally, J.T. contends that the Hearing Officer improperly rejected her "education records" claim seeking copies of class rosters and various emails. The Court concludes that the Hearing Officer missed the mark on the compensatory education award—mostly by placing inapt reliance on *J.T. II*—and failed to fully engage with certain of J.T.'s claims about the 2021–22 school year. But the Court agrees that the Hearing Officer made the right call on the records claim. The Court discusses each issue in turn.

I.    **The Court Should Remand For Further Proceedings On Compensatory Education**

Start with some foundation. Broadly speaking, "compensatory education aims to put a student … in the position he would be in absent the FAPE denial." *B.D.*, 817 F.3d at 798. An award of compensatory education, like all forms of IDEA relief, "depends on 'equitable considerations.'" *Reid*, 401 F.3d at 523 (quoting *Florence County Sch. Dist. Four v. Carter*, 510 U.S. 7, 15–16 (1993)). In this way, "[a]n appropriate compensatory education award must 'rely on individualized assessments,' and the equitable and flexible nature of the remedy 'will produce different results in different cases depending on the child's needs.'" *B.D.*, 817 F.3d at 798 (quoting *Reid* 401 F.3d at 524); *see also Reid*, 401 F.3d at 524 ("[J]ust as IEPs focus on disabled students' individual needs, so must awards compensating past violations rely on individualized assessments.").

Fashioning a compensatory education award is an imperfect science, to be sure. Indeed, the D.C. Circuit has "recognize[d] … the difficulty inherent in figuring out both what position a student would be in absent a FAPE denial and how to get the student to that position." *B.D.*, 817 F.3d at 799. Mindful of that difficulty, the Circuit has instructed that if "further assessments are needed" to craft an appropriate award, a "Hearing Officer should not hesitate to order them[.]" *Id.* at 800; *see also Reid*, 401 F.3d at 526 ("[T]he parties must have some opportunity to present evidence regarding [a student's] specific educational deficits resulting from [the] loss of FAPE and the specific compensatory measures needed to best correct those deficits."). At bottom, "the essence of equity jurisdiction is to do equity … meaning that flexibility rather than rigidity should be the guide." *Lopez-Young v. Dist. of Columbia*, 211 F. Supp. 3d 42, 55 (D.D.C. 2016).

That said, a compensatory education award is not always "mandatory in cases where a denial of FAPE is established," such as where a student did not suffer any educational harm due to the denial. *See J.T. II*, 2023 WL 8369938, at *14. Where the record establishes that a FAPE denial

did harm the student and prevented educational progress, however, "simply refusing to grant" an award of compensatory education "clashes with *Reid*" and its emphasis on "a 'qualitative focus on individual needs of disabled students.'" *Stanton v. Dist. of Columbia*, 680 F. Supp. 2d 201, 207 (D.D.C. 2010) (citing *Reid*, 401 F.3d at 527); *accord Butler v. Dist. of Columbia*, 275 F. Supp. 3d 1, 5 (D.D.C. 2017). As such, a hearing officer without sufficient information to fashion an appropriate award has "at least two options": (1) "allow the parties to submit additional evidence to enable … an appropriate compensatory education award," or (2) "order the assessments needed to make the compensatory education determination[.]" *Butler*, 275 F. Supp. 3d at 5. But what the hearing officer "cannot do" in that scenario is "outright reject an award for compensatory services and terminate the proceedings." *Id.* (citing *Stanton*, 680 F. Supp. 2d at 207).

Applied here, these principles make clear that the Hearing Officer's decision to brush aside J.T.'s request for compensatory education relief was in error. Recall that the Hearing Officer identified two FAPE denials by DCPS: "proceeding with the November 3, 2021 IEP meeting without the Parents' participation" and "offering an inappropriate in-person education placement in the IEP, when [V.T.] was only attending school online." (AR at 37.) But the Hearing Officer denied compensatory education, with the only proffered rationale being that J.T. "did not propose a compensatory education plan[.]" (*Id.* at 40; *id.* at 41 ("Because Petitioners have failed to demonstrate what compensatory education, if any, should be provided to Student for the denials of FAPE in this case, I will deny the Parents' request for a compensatory education award.").) In short, the Hearing Officer found that J.T. waived any entitlement to compensatory education by failing to create a sufficient record for such an award during the proceedings.

The Hearing Officer's determination was grounded almost entirely in *J.T. II*, 2023 WL 8369938. Because that ruling "concerned the same parties and [was] so recent," the Hearing

Officer posited, he believed its "compensatory education analysis to be on point and persuasive." (AR at 40.) But beyond those superficial similarities, the Hearing Officer did not explain why the substantive reasoning of *J.T. II*'s compensatory-education analysis supposedly mapped onto the FAPE denials that were found to have occurred here.

It does not. *J.T. II* mostly addressed compensatory education as related to the District's FAPE denial in "not including additional transportation accommodations in [V.T.'s] 2020 IEP." *J.T. II*, 2023 WL 8369938, at *13. Even though that omission "violated V.T.'s substantive rights under the IDEA," the court explained, there was nothing in the record to demonstrate "that the transportation deficiency harmed V.T.'s education during the 2020–2021 school year" because the COVID-19 pandemic meant "bus transportation was not occurring at that time" for anyone. *Id.* In other words, because the record did not show that V.T. suffered any actual harm or educational deficiency due to the lack of transportation accommodations in his IEP, the court's "fact-specific inquiry of the record [did] not support a finding that an unspecified compensatory education evaluation was deemed appropriate relief." *Id.* The court also discussed the broader absence of "any specific evidence of harm V.T. sustained stemming from the 2020 IEP formulation." *Id.* at *15. As the court put it, "the record [was] robust with evidence from teachers and administrators of V.T. performing at or better than expected for that school year [*i.e.*, 2020–21]." *Id.* For this reason, too, the *J.T. II* court held that "no compensatory education [was] required." *Id.*

Those considerations are inapplicable here. For one thing, unlike the "transportation accommodations" that would have never been provided anyway during the 2020–21 school year since "bus transportation was not occurring at that time," 2023 WL 8369938, at *14, the District here failed to craft a virtual-placement IEP for V.T. while he was indisputably approved for and actively engaged in virtual learning. So one cannot chalk up DCPS's violation to "no harm, no

foul" because V.T. would have benefited from an appropriately crafted virtual-placement IEP during the year. For another thing, unlike in *J.T. II*, there is little evidence in the record here—let alone "robust" evidence—to show that V.T. performed "at or better than expected" during the 2021–22 school year. *J.T. II*, 2023 WL 8369938, at \*15. The opposite was true. Unlike the IEP progress reports from the 2020–21 school year reflecting V.T.'s mastery of several academic goals and progress on many others (AR 110–19), the 2021–22 progress reports show that V.T. did not master any academic goals and made progress on fewer than half of them (*id.* at 1074–78). So V.T. certainly cannot be said to have "flourished" during the 2021–22 school year, as the *J.T. II* court believed true for the prior school year. Simply put, *J.T. II*'s "fact-specific" analysis about compensatory education is inapposite to the circumstances here.

The Court also acknowledges the Hearing Officer's one-sentence observation that there was no "evidence of the educational deficit or harm" caused by DCPS's FAPE denials. (AR at 41.) But for many of the reasons already discussed, and even accounting for the deference typically owed a hearing officer's factual findings, that statement is all but impossible to square with the record here. And the Hearing Officer did not engage in any fact-specific analysis to support it. *Reid*, 401 F.3d at 521 ("[A] hearing decision without reasoned and specific findings deserves little deference."); *Kerkam*, 931 F.2d at 87 (same). The absence of such analysis is particularly notable given the Hearing Officer's findings about the "many problems" with V.T.'s virtual placement at Deal in the fall of 2021, which ultimately prompted J.T. to educate V.T. herself at home. Amid all those challenges, DCPS prepared an updated IEP in November 2021—without input or participation from V.T.'s parents—that was predicated on an in-person placement at Deal, even though V.T. required specialized instruction and additional services by way of virtual instruction. As the Circuit found in somewhat analogous circumstances, "[i]t makes little sense to think that

the absence" of an appropriate IEP specially tailored to V.T.'s unique needs "left [V.T.] no worse off than he would have been had the District provided them." *B.D.*, 817 F.3d at 799.[6]

The Hearing Officer's observation that V.T. was reportedly doing "very well" at Friendship Public Charter School—in the years after leaving DCPS—does not change things. As J.T. rightly puts it, "[t]hat fact, while good to hear, says nothing about the harm [V.T.] suffered from DCPS's denials of FAPE in his last school year in their system, the only year in question in this case." (ECF No. 21 ("Pl.'s Mem.") at 15.) Insofar as the Hearing Officer was trying to use that testimony to suggest another similarity with *J.T. II* and its finding that V.T. "flourished" despite the alleged IDEA violations, the comparison is inapt. There, the court's analysis was premised on a finding that V.T. had "flourished" during the year covered by the allegedly deficient IEP, not years later. V.T.'s progress and academic performance years after the fact is a very different matter, and the Hearing Officer did not otherwise identify or discuss any evidence reflecting strong academic success during the 2021–22 year—certainly nothing along the lines discussed in *J.T. II.* In fact, as the Court already outlined, the evidence regarding V.T.'s progress in the 2021–22 year undercuts any such finding, especially when compared to the 2020–21 school year.

The bottom line is that the Hearing Officer's narrow reliance on *J.T. II* was misplaced. If anything, the facts underlying *J.T. I* present a far closer analogue to the situation here. *J.T. I*, 496 F. Supp. 3d 190. There, DCPS failed to provide V.T. an appropriate placement for essentially an entire school year (2019–20), in part because the placement it proposed in November 2019 was noncompliant with his IEP. *Id.* at 213. While not a perfect match, that is a reasonably close

---

[6] The Court was struck by the District's assertion, in its reply brief, that J.T. supposedly "concede[d] that she failed to present evidence of specific educational harm" simply by virtue of stating that she "sought further examination and determination of that impact by independent experts." (*See* ECF No. 28 at 4.) Suggesting the record would benefit from "further" expert assessment comes nowhere close to admitting that no evidence of harm exists without it. It is certainly no concession.

description of what happened here by virtue of the inappropriate November 2021 IEP. And in *J.T. I*, the court reasoned that because of DCPS's failings, V.T. was "entitled to compensatory education … as well as an independent evaluation to ascertain what, if any, progress V.T. would have made during the 2019–2020 school year, and by extension determine the compensatory education that V.T. needs." *Id.* These are the same remedies J.T. requests now.

Finally, beyond *J.T. II*, the District points to several cases in arguing that the Hearing Officer was correct to find J.T. waived any claim to compensatory education based on "a failure of proof." (ECF No. 23 ("Def.'s Mem.") at 24–26, 33 (citing and discussing cases).) They are all distinguishable. In *Wade v. District of Columbia*, for instance, the plaintiff expressly withdrew any claim for compensatory education in the hearing and "merely sought a subsequent IEP meeting" as a remedy. 2021 WL 3663630, at *5 (D.D.C. Aug. 18, 2021) ("A federal court … is not the form in which a litigant may pick up the sticks she dropped in an administrative hearing."). The same was true in *Jones v. District of Columbia*, 2017 WL 10651264, at *9 (D.D.C. Jan. 31, 2017) ("Plaintiff withdrew her request for compensatory education … prior to the administrative hearing[.]"). Nothing like that happened here. Otherwise, in *Smith v. District of Columbia*, the court agreed that a compensatory education award was unwarranted based on "insufficient evidence," but only because the hearing officer first gave the plaintiff "thirty days to supplement the record." 2023 WL 6291637, at *6 (D.D.C. July 31, 2023). Again, nothing like that happened here. The District also cites *Herrion v. District of Columbia*, 2023 WL 2643881, at *22 (D.D.C. Mar. 27, 2023), for the proposition that "a plaintiff [may also] waive the right to compensatory education by failing to present evidence of a proper compensatory education plan." (Def.'s Mem. at 24, 33.) But *Herrion* went on to find no waiver "because the Parents ha[d] insisted throughout th[e] case and in the administrative proceedings below that they [sought] relief in the form of

17

assessments to inform and ultimately aid in the calculation of an appropriate compensatory education award[.]" *Id.* So, in reality, *Herrion* cuts against the District and in favor of J.T. Finally, the District invokes *J.T. II*, but the Court already explained why that case is inapposite here.

J.T. has consistently pursued compensatory education for the 2021–22 school year—she certainly never expressly waived or withdrew that request—and the Hearing Officer never gave J.T. an opportunity to supplement the record, whether with the benefit of an additional DCPS-funded evaluation or otherwise, to substantiate an appropriate compensatory education award for the FAPE denials that affected V.T. This was error. The undersigned therefore recommends that the Court remand to the Hearing Officer to reconsider J.T.'s request for a compensatory education award. In remanding, the Court should instruct that the Hearing Officer may "allow the parties to submit additional evidence to enable … an appropriate compensatory education award," or "order the assessments needed to make the compensatory education determination[.]" *Butler*, 275 F. Supp. 3d at 5. But the Hearing Officer cannot simply "outright reject an award." *Id.*[7]

## II.    The Hearing Officer Should Reevaluate Additional Claims On Remand

Beyond her compensatory-education claim, J.T. contests several of the Hearing Officer's determinations about DCPS's implementation of V.T.'s IEP during the 2021–22 school year, including between V.T.'s initial placement at Deal in September 2021 and the November 2021 IEP. Specifically, J.T. complains about: (1) the overall unworkability of the prescribed specialized instruction with the Deal virtual placement, especially given the "many problems" the Hearing Officer identified with online services at Deal; (2) a class size above the limit prescribed by V.T.'s

---

[7] Because the Court recommends remanding on the compensatory education issue with these instructions, it need not reach J.T.'s alternative argument that the Court should order a compensatory education meeting. (Pl.'s Mem. at 22–26.) Relatedly, because the Court agrees that the Hearing Officer's compensatory education analysis was deficient based on the record as it exists, the Court need not consider whether to accept J.T.'s additional evidence in the form of Exhibits 1 through 9 to her summary judgment motion.

IEP; (3) the lack of a functional dedicated aide for V.T.; and (4) DCPS's failure to provide all the speech-language therapy and behavioral support services hours prescribed by V.T.'s IEP.

As an initial matter, the District seems to suggest that these claims—or at least some subset of them—were not included in J.T.'s administrative complaint(s) and are therefore unexhausted. (Def.'s Mem. at 22–23, 38–39.) "The law is clear that the scope of an IDEA hearing extends only to those issues raised in the [d]ue [p]rocess [c]omplaint, and that matters not presented to the Hearing Officer are not administratively exhausted for the purposes of district-court review." *Adams v. Dist. of Columbia*, 285 F. Supp. 3d 381, 394 (D.D.C. 2018) (collecting cases).

To the extent the District is talking about claims focused on the 2020–21 school year under the prior IEP—before V.T.'s virtual placement at Deal—the District is correct. But J.T. is not arguing otherwise. Her claims focus on the period from September 2021 forward, under the prior IEP but after V.T.'s virtual placement at Deal. And the amended due process complaint raised claims about DCPS's failure to provide V.T. with various elements of his IEP during the 2021–22 school year at Deal. (AR at 576–79.) While there was originally some uncertainty as to whether the timeframe before the November 2021 IEP (*i.e.*, back to the start of the school year) was properly at issue, the Hearing Officer ultimately dispelled that uncertainty. He deemed the allegations about "an inappropriate placement … to date to [V.T.'s] placement at [Deal] on or around September 9, [2021]."[8] (AR at 24 n.2.) Plus, the Hearing Officer's substantive engagement with DCPS's alleged shortcomings in implementing V.T.'s IEP during the earlier part of the year (*see* AR 29–34) further supports that these claims were exhausted and properly at issue below.

The one exception relates to J.T.'s claim that DCPS failed to provide a dedicated aide for V.T. As DCPS correctly argues (Def.'s Mem. at 22), the due process complaint(s) did not raise any

---

[8] The Hearing Officer used "September 9, 2023," but, given the broader context, J.T. says the use of "2023" was a scrivener's error for "2021." The Court agrees, especially since the District does not argue otherwise.

claim to this effect (AR at 576–79), and this remained true even after the Hearing Officer deemed the original complaint to be insufficiently detailed (*id.* at 571). The amended complaint added more specificity, outlining DCPS's alleged failure to provide "specialized instruction prescribed in [the] IEP," "all occupational therapy, speech-language pathology, and behavior support related services prescribed in [the] IEP," and "a classroom as small as prescribed in the IEP." (AR at 577.) But it did not mention the dedicated aide prescribed by the IEP. Neither did the Hearing Officer's prehearing order specify a claim to this effect; it understandably focused on the specific allegations in the amended complaint. (AR at 613–14 (specifying the relevant issue as whether "DCPS denied [V.T.] a FAPE at Deal Middle School in the 2021–2022 school year by failing to provide all IEP specialized instruction and all occupational therapy, speech-language pathology, and behavioral support related services; and a classroom setting as small as prescribed in the IEP").).

J.T. does not dispute these facts. Instead, she emphasizes that her counsel "questioned multiple witnesses regarding the aide and lack thereof" and "argued the aide issue in [the] closing, with no objection from DCPS." (Pl.'s Reply at 22–23.) But even if true, these rejoinders miss the point. The due process complaint and the prehearing order frame the issues, and that seems especially important here given the Hearing Officer's requirement that the complaint be amended to provide greater specificity after deeming the original filing insufficient and too vague. *Adams*, 285 F. Supp. 3d at 394 (finding claim unexhausted even though it was "discussed during the hearing" when it was not explicitly presented in the due process complaint or identified in prehearing order); *Dist. of Columbia v. Pearson*, 923 F. Supp. 2d 82, 87–88 (D.D.C. 2013). The Court finds J.T.'s claim for failure to provide a dedicated aide to be unexhausted.

The Court next turns to evaluating each of J.T.'s other theories against the record.

*First*, as to whether DCPS properly implemented V.T.'s specialized instruction during his virtual placement at Deal, the Hearing Officer thought that claim unsubstantiated because the record supposedly "[did] not establish how many hours or services were available to [V.T.] online … before December 2021, when [J.T.] apparently gave up on virtual special education and decided that she would teach [V.T.] herself." (AR at 32.) But this statement came in the wake of the factual findings about the "many problems" with V.T.'s virtual placement at Deal, including that: (1) V.T. had problems logging into the CES classroom; (2) V.T. "was the only distance-learning student" and "could only view the teacher and the blackboard – not the rest of the class"; (3) V.T. "could not follow the teacher in class"; (4) "[t]here were no visual aids or instructions" for V.T.; and (5) "[i]t was difficult to communicate with the dedicated aide because the aide did not have a computer to be online with [V.T.] or the class." (*Id.* at 21.) These are notable findings. Yet the Hearing Officer failed to meaningfully engage with them in turning aside J.T.'s claim about specialized instruction. Fair engagement with the full record, including the Hearing Officer's own factual findings, requires more. The undersigned recommends that the Court remand for further consideration on this point—namely, whether and to what extent the "many problems" the Hearing Officer identified with V.T.'s placement gave rise to a FAPE denial. *Shaw v. Dist. of Columbia*, 2019 WL 49831, at *20 (D.D.C. Feb. 8, 2019) (recommending remand on issues likely to "implicate educational policy concerns that fall within the Hearing Officer's expertise").

*Second*, J.T. asserts that the Deal placement exceeded the nine-student maximum prescribed by V.T.'s IEP(s). The Hearing Officer declined to engage with this claim as "moot" on the basis that V.T. attended classes virtually, not in person. (AR at 32.) This was a dodge. Virtual or not, a larger class size would make it harder for the teacher "to provide individualized instruction to [V.T.'s] level and "any 1-on-1 help," as J.T. appropriately argues. (Pl.'s Mem. at 34 n.12.) Plus,

the District does not really defend the Hearing Officer's mootness finding, focusing instead on arguing why the evidence supposedly showed that V.T.'s class was not too large. (Def.'s Mem. at 39.) For at least these reasons, the Court believes the Hearing Officer was too quick to adjudge the claim moot, at least without a more fulsome explanation considering the points just mentioned. And while the evidence about class size would be up to the Hearing Officer to weigh and interpret in the first instance, the Court observes that DCPS points only to testimony about the District's *general policy* for CES classrooms (*see id.* (citing AR at 1586 ("So, the CES classroom policy is that the max of students is eight students in the classroom."))), whereas J.T. testified that V.T.'s teacher told her the specific classroom here had "more than 10 kids" (*see* Pl.'s Mem. at 34 (citing AR at 1466)). The latter evidence seems far more compelling on the specific question at hand—*i.e.*, V.T.'s actual class size, rather than a policy in the abstract—and the District was certainly in a position to refute J.T.'s testimony, if appropriate, with evidence as to the actual number of students on the roster for the Deal CES classroom during the 2021–22 school year.[9] The undersigned recommends that the Court remand for further consideration on the class-size claim, as well.

**Third**, this leaves J.T.'s argument that the District failed to provide the full measure of speech-language therapy and behavioral support services hours prescribed by the IEP(s).

As to behavioral support, the Hearing Officer credited the testimony of the social worker who provided them, who said she was "pretty consistent" with the services. (AR at 32; *see also id.* at 1691 ("I believe it was Thursdays at 12:00 … every week. And the only time we may have missed is if there was maybe a closure or something of that nature. But other than that, we always

---

[9] Indeed, as the Court understands things, this is the reason J.T. asked the District to produce V.T.'s class rosters. While the Court agrees with the District that it was not *required* to produce those rosters as "education records" under the statute (as explained below), DCPS certainly could have opted to introduce evidence—or at least specific and particularized testimony from V.T.'s teacher—about the actual class size, assuming the information supported its position on this point and undercut J.T.'s.

made up services if he couldn't have it that specific time or day."); *id.* at 1697 ("He's the only virtual student I had. So, I made sure that I allotted time for him.").) J.T. contests the Hearing Officer's determination on this point because the DCPS service trackers assertedly reflect a considerable shortfall in the hours provided, despite testimony from DCPS witnesses. (Pl.'s Mem. at 36 (citing AR at 325–41).) The Court acknowledges some tension between the hours shown in the service trackers and the social worker's testimony that she was "consistent." But that tension was placed squarely before the Hearing Officer during witness examination (*see* AR 1694–98), and the Hearing Officer credited the witness's testimony on the issue against the record as a whole. The Hearing Officer's finding on this point is entitled to deference, and J.T. has not carried her burden to show that the Hearing Officer's determination was wrong. *See, e.g.*, *Garris v. Dist. of Columbia*, 210 F. Supp. 3d 187, 190 (D.D.C. 2016) ("[T]hese objections are about how the Hearing Officer weighed the evidence .... That Plaintiffs draw a different conclusion from that evidence does not make the Hearing Officer's alternative conclusion improper."); *A.W. v. Dist. of Columbia*, 2014 WL 12884524, at *5 (D.D.C. Sept. 19, 2014) (reiterating that IDEA plaintiffs cannot secure reversal of a hearing officer's decision simply because "some evidence in the record, if given substantial weight, could support a finding in their favor").

As to the speech-language therapy, the Hearing Officer looked to the District's service trackers to conclude that V.T. received 2,640 minutes of services and missed 140 minutes due to absences, which meant DCPS failed to provide about "470 minutes out of 3,240 minutes" of prescribed services—an approximately 15% shortfall. (AR 32–33.) J.T. relies on those same service trackers to argue the actual hours were far less, including because the Hearing Officer "incorrectly counted" certain categories of time in his total. (Pl.'s Mem. at 35.) In other words, J.T.'s fact-based argument again boils down to a disagreement on how the Hearing Officer weighed

and interpreted the evidence, and the Court defers to the Hearing Officer's assessment on that factual finding, *Garris*, 210 F. Supp. 3d at 190—that DCPS should have provided V.T. with about eight additional hours of speech-language therapy services in 2021–22 school year.

That leaves the question of whether that eight-hour shortfall was a "material failure" to implement V.T.'s IEP. Relying on *Middleton v. District of Columbia*, 312 F. Supp. 3d 113, 144–45 (D.D.C. 2018), the Hearing Officer concluded it was not. (AR at 34.) The Court agrees.

Courts in this District agree that "[a] material failure to implement a student's IEP constitutes a denial of a FAPE." *Middleton*, 312 F. Supp. 3d at 144 (citing *Johnson v. Dist. of Columbia*, 962 F. Supp. 2d 263, 268–69 (D.D.C. 2013)). "Generally, in analyzing whether a student was deprived of an educational benefit, 'courts ... have focused on the proportion of services mandated to those actually provided, and the goal and import (as articulated in the IEP) of the specific service that was withheld.'" *Id.* (quoting *Beckwith v. Dist. of Columbia*, 208 F. Supp. 3d 34, 49 (D.D.C. 2016)). In *Middleton*, the court found that a 20–40% deprivation of a student's specialized instructional hours was material and not *de minimis*, *id.* at 145, and other courts in this District have reached similar results on similar facts, *see Beckwith*, 208 F. Supp. 3d at 49–51 (finding that a failure to provide "between 207.5 and 287.25 hours of required instruction" during the year was a meaningful deprivation of educational benefits and thus a denial of FAPE); *Turner v. Dist. of Columbia*, 952 F. Supp. 2d 31, 40–41 (D.D.C. 2013) (finding that a failure to provide eleven hours per week of specialized instruction was material). By contrast, courts have come down the other way where the implementation shortfall was more modest and did not implicate core instruction time but rather ancillary related services. *See, e.g.*, *Catalan v. Dist. v. Columbia*, 478 F. Supp. 2d. 73, 75–76 (D.D.C. 2007) (holding that a failure to provide modestly fewer speech-therapy hours than prescribed was not material enough to constitute a FAPE deprivation, where

the record still showed that the student "received consistent speech therapy in accordance with the IEP"). *see also T.M. v. Dist. of Columbia*, 75 F. Supp. 3d 233, 242 (D.D.C. 2014) (holding that ten missed hours of occupational therapy out of about 34 hours was not a material failure).

J.T.'s claim fits far more comfortably within the latter camp. The Hearing Officer found DCPS failed to provide V.T. with slightly fewer than 8 hours of speech-language therapy services over the course of the year. That figure sounds more significant when expressed in percentage terms of 15%, which explains why J.T. tries to analogize to a 15% "change in inflation from 3% to 18%" or an academic grade dropping "from an A+ to a B." (Pl.'s Mem. at 35.) But those arguments just demonstrate why percentage-based comparisons often require more context, especially in the context of relatively small numbers, as here. Despite the District's modest shortfall, the record nevertheless shows that V.T. "received consistent speech therapy in accordance with the IEP." *Catalan*, 478 F. Supp. 2d. at 76. And as the Hearing Officer noticed, J.T. "did not call a speech and language expert or other professional to testify about the goal and import of the hours of SLP services that were not provided." (AR at 34.) In other words, J.T. failed to show how the gap in speech-language services was material. The briefing before this Court fares no better. Apart from rhetoric, J.T. fails to identify any helpful caselaw, and she does not even attempt to engage with the Hearing Officer's reliance on *Middleton* and the relevant legal principles above.

Thus, the Court finds that J.T. failed to show that the Hearing Officer was wrong in her rejecting her claims based on behavioral-support and speech-language services.

## III.    J.T.'s Claim for Education Records

J.T.'s final challenge to the Hearing Officer's decision focuses on her inability to obtain from DCPS certain documents that she contends qualify as "education records" under the IDEA. She says the Hearing Officer should have ordered DCPS to produce certain emails related to V.T.

and his placement, as well as copies of V.T.'s class rosters. (Pls.' Mem. at 37.)[10] In her briefing, J.T. posits that if the Court grants relief in her favor on other grounds, this claim would become moot. Since the Court recommends a remand to the Hearing Officer on the issue of compensatory education, it could take J.T. at her word and decline to pass on this secondary claim. But in the interest of thoroughness on review, the Court addresses it all the same.[11]

The IDEA requires that a school district provide "[a]n opportunity for the parents of a child with a disability to examine all records relating to such child[.]" 20 U.S.C. § 1415(b)(1). The statute's implementing regulations add a bit more meat to those bones, providing that "[e]ach participating agency must permit parents to inspect and review any *education records* relating to their children that are collected, maintained, or used by the agency under this part." 34 C.F.R. § 300.613(a) (emphasis added). "Education records," as used in the regulation, "means the type of records covered under the definition of 'education records' in 34 CFR part 99 (the regulations implementing the Family Educational Rights and Privacy Act of 1974 [("FERPA"]." 34 C.F.R. § 300.611(a), And that regulation defines "education records" as "those records that are: (1) directly related to a student; and (2) maintained by an educational agency or institution[.]" 34 C.F.R. § 99.3(a); *see also* 20 U.S.C. § 1323g(a)(4)(A) (defining "education records" in the same way).

Two decades ago, the U.S. Supreme Court interpreted the term "education records," as used in FERPA, to decide whether "peer-graded classroom work and assignments" fit the bill. *Owasso Indep. Sch. Dist. v. Falvo*, 534 U.S. 426 (2002). In holding they did not, *Owasso* focused in large part on the definition's inclusion of the term "maintain," which the Court believed was suggestive

---

[10] Specifically, J.T. through counsel asked that DCPS provide "all emails, including internal email, directly related to [V.T.] and maintained by DCPS," and "a class roster for [V.T.'s] class, with other students' names redacted, as of September 1, 2021, November 1, 2021, and May 1, 2021." (AR at 588.)

[11] J.T. filed a "motion to compel" production of these records at an earlier point in the case, which the Court denied as procedurally improper. *J.T. v. Dist. of Columbia*, 2024 WL 5075805 (D.D.C. Dec. 11, 2024).

of records "kept in a filing cabinet in a records room at the school or on a permanent secure database[.]" 534 U.S. at 433. Plus, under FERPA, institutions shall "'maintain a record, kept with the education records of each student'" that "must list those who have requested access to the student's education records and their reasons for doing so." *See id.* at 434 (citing 20 U.S.C. § 1232g(b)(4)(A)). And "FERPA requires a 'record' of access for each pupil" that "must be kept with the education records," charging a "school official" with responsibility for the records. *See id.* at 434-35. All these indicators, the Court reasoned, "impl[y] that education records are *institutional records kept by a single central custodian*[.]" *Id.* at 435 (emphasis added). "Individual assignments handled by many student graders in their separate classrooms" were not that. *Id.*

In the years since, multiple federal courts have applied *Owasso*'s reasoning to conclude that ordinary school-staff emails—like the ones J.T. requested here—fall comfortably outside the definition of "education records" under the IDEA, except where they are specifically added to a student's official file. *See, e.g.*, *Doe v. Rutgers*, 2023 WL 2239399, at *3 (3rd Cir. Feb. 27, 2023) (holding that routine emails are not "education records" under FERPA "because they are not … institutional records and are not held by a central custodian"); *Burnett v. San Mateo Foster City Sch. Dist.*, 739 F. App'x 870, 873-74 (9th Cir. 2018) (concluding that school district did not violate IDEA "when it only turned over emails concerning [a student] that had been printed and added to [the student's] physical file"); *S.B. v. San Mateo Foster City Sch. Dist.*, 2017 WL 4856868, at *18 (N.D. Cal. Apr. 11, 2017) (agreeing it was appropriate for the school district to limit production of "education records" to "those contained in [the student's] central file"); *E.D. v. Colonial Sch. Dist.*, 2017 WL 1207919, at *10 (E.D. Pa. Mar. 31, 2017) ("Unless Defendant kept copies of e-mails related to E.D. as part of its record filing system with the intention of maintaining them, we cannot reach the conclusion that every e-mail which mentions E.D. is a bona fide education record within

27

the statutory definition."); *S.A. v. Tulare Cnty. Ofc. of Educ.*, 2009 WL 3126322, at *5-7 (E.D. Cal. Sept. 24, 2009) (concluding that emails not placed in a student's "permanent file" are not "maintained" by the school district and thus not "education records"). This Court agrees.

J.T.'s only real rejoinder is to argue that "DCPS work emails are kept secure on DCPS servers – i.e., 'maintained' – as are class rosters." (Pl.'s Mem. at 38.) That may be true, but it oversimplifies the necessary analysis and ignores the more nuanced interpretation of "maintain" explicated by the Supreme Court in *Owasso* and applied in many cases since to exclude routine email correspondence from the ambit of "education records" under FERPA and the IDEA.[12] And at least on the facts here, the same analysis applies to the class rosters. As the District explains, DCPS witnesses testified about DCPS's EasyIEP Special Education Data System ("SEDS") and the Aspen database, which serve as central repositories for official files and records, and confirmed that no emails or class rosters were maintained or located in those systems in the course of searching for records in response to J.T.'s requests. (AR at 1590-92, 1712.)

Simply put, based on the governing legal precedent and the evidence presented at the hearing, the Hearing Officer appropriately concluded that DCPS did not violate the IDEA by declining to produce the additional emails and class rosters that J.T. requested.

## CONCLUSION AND RECOMMENDATION

For these reasons, the undersigned **RECOMMENDS** that the Court **GRANT IN PART** and **DENY IN PART** both Plaintiff's motion for summary judgment (ECF No. 21) and the

---

[12] J.T. also tosses out a one-sentence argument that DCPS was required to produce "computer media" records under the FERPA regulatory definitions, which she says encompasses "emails." (Pl.'s Mem. at 38.) But "computer media" is a component of the definition of "record" within those regulations, and the IDEA and its implementing do not require the production of any "record" writ large, but only "education records." And J.T.'s argument that emails comprise "education records" fails for the reasons explained.

District's motion for summary judgment (ECF No. 23) and **REMAND** to the Hearing Officer for further proceedings consistent with this opinion.

Specifically, the Court should **REMAND** to the Hearing Officer with instructions to: (1) reconsider J.T.'s claim for compensatory education—including by ordering any assessments needed to fashion an appropriate award, or by at least allowing the parties to submit additional evidence on that issue—and (2) reconsider J.T.'s claims that DCPS failed to properly implement V.T.'s IEP during the 2021–22 school year at Deal as to: (a) specialized instruction in light of the "many problems" with V.T.'s virtual placement identified by the Hearing Officer; and (b) V.T.'s class size. The Court should otherwise deny J.T.'s motion and grant the District's motion and uphold the other determinations in the Hearing Officer's decision.

Dated: July 21, 2025

                                     _____

                                         MATTHEW J. SHARBAUGH
                                         United States Magistrate Judge

\*    \*    \*

The Court hereby advises that, pursuant to 28 U.S.C. § 636(b)(1)(C) and LCvR 72.3(b), any party who objects to a report and recommendation must file a written objection within fourteen (14) days of the party's receipt of the report and recommendation. The written objections must specifically identify the portion of the report or recommendation to which objection is made and the basis for such objections. Failure to file timely objections to the findings and recommendations set forth in this report may waive that party's right of appeal from an order of the District Court that adopts such findings and recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985).